IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 26, 2018

**RICKY HARRIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Carter County**
**No. 24113       James F. Goodwin, Judge**

_____

**No. E2017-01974-CCA-R3-ECN**

_____

In 1988, a Carter County jury convicted the Petitioner, Ricky Harris, of first degree murder. On direct appeal, this court affirmed the Petitioner's convictions. *See State v. Ricky Jerome Harris*, No. 85, 1990 WL 171507, at *25 (Tenn. Crim. App., at Knoxville, Nov. 8, 1990), *perm. app. denied* (Tenn. Feb. 4, 1991). In 2017, the Petitioner filed a petition for a writ of error coram nobis. The trial court held a hearing and denied the petition. On appeal, the Petitioner contends that he is entitled to coram nobis relief based upon newly discovered evidence as well as evidence withheld by the prosecution. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Ricky Harris, Pikeville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony W. Clark, District Attorney General; and Kenneth C. Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Background**

This case arises from the Petitioner's involvement in the death of his mother-in-law. The victim, a sixty-seven-year-old woman, went missing from her home and her skeletal remains were found in a nearby lake four months later. This court summarized the facts presented at the Petitioner's trial as follows:

On September 8, 1987, Dolly Gouge, who was sixty-seven years of age at the time, lived . . . in Carter County. . . . . Mrs. Gouge's daughter, Laverne Ruth Gouge Harris, was, at that time, the wife of the [Petitioner]. They were separated and she lived with her mother. Laura Harris, the [young] daughter of the [Petitioner] and Laverne, also lived there, as did Mrs. Gouge's mother, Vena Odom, who was ninety-one years of age. Mrs. Odom lived in a small house adjacent to Mrs. Gouge's house.

Early that morning, Laura urinated on her grandmother, Mrs. Gouge, who took off her housecoat and pajama bottom and put on another light housecoat with the pajama top. Laverne and Laura Harris departed at 7:55 A.M. Mrs. Harris dropped her daughter off at the day care center and went to work.

Helen Hopson was Mrs. Gouge's sister. At about 8:00 or 8:30 every morning Mrs. Gouge called Mrs. Hopson to report on the condition of their mother. On September 8, Mrs. Hopson did not receive the usual call from her sister, so she called Mrs. Gouge's residence three times. When there was no answer, she and her husband drove to Mrs. Gouge's home to determine why her sister had not answered. When she arrived, she found the television and the lights on in the house. She searched throughout the house, including under the beds and in the closets, but could not find Mrs. Gouge. Around the flower bed near the door, Mrs. Hopson smelled an odor which reminded her of a hospital.

At 9:45 or 9:50 A.M., Mrs. Hopson notified Mrs. Harris that Mrs. Gouge was missing. Mrs. Harris went home immediately, arriving at 10:10 A.M. She called the police and her brother. She also attempted to call the [Petitioner] at his place of employment, Sherwood Chevrolet-Nissan, Inc., in Johnson City. Mrs. Harris also smelled the hospital odor near the door.

Officers responded and found Mrs. Gouge's glasses lying off the edge of the porch, and a blue woman's shoe and Mrs. Gouge's lower denture in the flower bed. The flowers were laid over and stepped on as though someone had been wrestling in the flower bed. A hair roller with hair in it was found on the sidewalk. The inside of the house was very neat. Mrs. Gouge's purse was found on the kitchen table, along with her Bible, a church record book and the keys to her car, which was parked outside her home. Her pajama bottom was found in the clothes hamper.

2

The [Petitioner] arrived at Mrs. Gouge's home just ahead of the police officers and was interviewed at the scene concerning what, if anything, he knew about the victim's disappearance. The [Petitioner], who had previously lived there with his wife, daughter and mother-in-law, stated that he had been there that morning to get two of his jackets. He arrived at approximately 8:00 A.M., but received no answer when he knocked at the door. He left, drove down the road, then decided to return to get some phonograph records, but did not do so. He denied seeing Mrs. Gouge at all that day.

A massive search was undertaken for Mrs. Gouge. A tracking dog was brought to her home to ascertain whether she had walked away or whether she left by a vehicle. The dog handler testified that due to the inability of his dog, Sergeant Duke, to find a track from her home, that it was his opinion Mrs. Gouge did not walk away. All efforts to locate Mrs. Gouge proved unsuccessful at that time.

On December 23, 1987, portions of a skeleton were found on a wooded hillside adjacent to the Carr Cemetery in a rural area of Washington County known as Watauga Flats. A flowered robe, identified as the one Mrs. Gouge was wearing that morning, her upper denture and hair rollers with hair matching Mrs. Gouge's were found in the area. The decayed body had been dismembered by animals and only portions of the skeleton were found. The hair from her scalp was found, as was the mate to the shoe found in the flower bed. Dr. William Bass, Professor of Anthropology and head of the Anthropology Department at the University of Tennessee at Knoxville, testified concerning the identification of the bones. It was his opinion that from all of the circumstantial evidence the bones found were the remains of Mrs. Gouge. It was impossible to determine from the remains how Mrs. Gouge died.

The [Petitioner] was a suspect from the early days of the investigation. As a salesman for Sherwood Chevrolet, he drove a demonstrator automobile belonging to the dealership. Three days after Mrs. Gouge's disappearance, the [Petitioner's] employer made the car available to the police. The trunk was vacuumed and one hair was discovered which matched the hair on Mrs. Gouge's head. The [Petitioner] consented to a search of his room that he occupied at a motel. No incriminating evidence was found, although a pair of binoculars was found.

3

The binoculars were important because between 7:30 and 7:55 A.M. that morning four witnesses saw a man sitting in a car parked on the opposite side of the four lane highway from the victim's home looking in the direction of her home with binoculars. The car was variously described as a new or late model car, silver or light in color with stickers in the back window on the driver's side. The man in the car was variously described as fairly tall, having "kinda broad shoulders," with hair described as "brownish blonde" to "medium to dark brown." He was described as having a short hair cut and maybe a small mustache. He was said to have a medium complexion and was well dressed, wearing a white long sleeve shirt with a sport coat lying on the seat. One witness described the man as "very professional looking," and she thought she was seeing an officer in an unmarked police car.

One of the witnesses saw the same car again at approximately 8:10 to 8:15 A.M. as the car pulled onto Highway 19E at a bridge at the interstate highway. The driver was the same individual that she had seen before and no one else was visible in the car. Although she did not know the [Petitioner] and had been shown no photographs of him, at the trial she identified the [Petitioner] as the person she saw driving the car.

Joyce Hinkle was the victim's next door neighbor. The victim's home was located a long distance from the Rittertown Road on a hillside. Another house was located in front of the victim's home and there was a long driveway from the road to the victim's house. The driveway passed by Mrs. Hinkle's house and the victim actually lived behind Mrs. Hinkle's home. Mrs. Hinkle knew the [Petitioner] well from his having lived in the victim's home. Between 8:15 and 9:00 A.M., Mrs. Hinkle looked out and saw a light colored automobile with Sherwood Chevrolet stickers in the back driver's side window. The car was parked directly in front of the victim's driveway. She saw no one around the car. When she stepped out on her back porch, she heard Mrs. Gouge's voice give out a surprised "holler" or yell. The sound came from the front entrance of the victim's house. She heard nothing else and went on to the garbage can where she burned some trash. She stayed there while the trash burned, watching a squirrel playing in the victim's front yard. She saw the [Petitioner] coming from the area of Mrs. Gouge's mother's house walking at a fast pace, clutching something in his hands. He went around to the front entrance of the victim's home, then came back around and seconds later he went back around the house completely out of her sight. He was wearing dark brown

4

cotton work gloves and was clutching a bottle similar to the bottles in which Armorall is packaged.

On his second trip around the house "he stepped out in (her) face," startling both Mrs. Hinkle and the [Petitioner]. They spoke and he went on down the driveway. He got in the car and drove away toward Elizabethton. A few minutes later she saw the same car going toward Roan Mountain. The [Petitioner] then drove into the victim's driveway at a fast speed. He was not wearing gloves at this time and he waved to Mrs. Hinkle and said he was going to Mrs. Gouge's to get his albums. A few minutes later he came back down the driveway at such a fast speed that she did not think he would be able to safely navigate the turns in the driveway. However, he was able to do so and he turned on the Rittertown Road toward Roan Mountain. When she first saw him at the house the [Petitioner] was dressed in a long sleeve light colored shirt, but when he came down the driveway he was dressed in a dark colored polo shirt or T-shirt and worn blue jeans.

Nannie Stephens, another neighbor who lived near Mrs. Gouge, was walking to Mr. Gouge's house carrying some vegetables from her garden for Mrs. Gouge. She saw the car come out of the driveway and proceed toward Roan Mountain. She went on to the victim's house and went through the house and around it twice looking for Mrs. Gouge. She saw that the television set and the lights were on and noted that the flowers were matted down. She saw the shoe in the flower bed. She looked in on Mrs. Gouge's elderly mother, who was eating, but did not bother her. Mrs. Stephens returned home and called the victim's house several times. She received no answer until the last call. Mrs. Hopson, the victim's sister, had arrived and answered the telephone.

On the day of the victim's disappearance the [Petitioner] was asked to go to the sheriff's department. When he left the sheriff's department, Walter William Foster was assigned the duty of following the [Petitioner] in plain clothes, driving his personal vehicle. He followed him to the motel where the [Petitioner] was living, thence to Sherwood Chevrolet, and then to his attorney's office where Mr. Foster went in, and saw the [Petitioner] sitting in the waiting room. The [Petitioner] and his attorney came outside, opened the trunk of the car, looked in it and talked. The [Petitioner] then left, bought gas and went to a car wash where he stopped his car, with the rear of the car near the vacuum cleaner. He stayed there two or three minutes. However, from his vantage point, Mr. Foster could not determine

5

whether the [Petitioner] vacuumed the car. The [Petitioner] then washed his car. When he left, he zipped in and out of traffic and lost Mr. Foster.

. . . .

The [Petitioner] told conflicting stories to his co-workers at the automobile dealership concerning his whereabouts on the morning of September 8, 1987. He told the sales manager when he arrived shortly after 10:00 A.M. that he had kept an appointment with his lawyer that morning. However, he had told Bill Nichols, another salesman at Sherwood Chevrolet, that he was going to meet a man named Jim from Chicago at the Tri-Cities Airport. Allegedly Jim was to arrive on a private jet bringing a large amount of cash with him. No other details of this meeting were revealed.

In July 1987, the victim and the [Petitioner] had a confrontation over the [Petitioner's] marital problems with the victim's daughter. Mrs. Gouge told the [Petitioner] that "his gravy train was over" at her house, that he was no longer welcome there and that she was backing her daughter in the divorce action. She told the [Petitioner] to get out and to never come back. His clothes were packed in plastic bags and placed on the front porch. His record albums were in a long box, which was also placed on the front porch. The [Petitioner] told his wife several times that Mrs. Gouge was the cause of their marital problems because she was putting ideas in his wife's head about divorcing him.

The [Petitioner] testified, vehemently denying that he killed Mrs. Gouge. He admitted that he had a confrontation with her on July 17, 1987, the date that he separated from his wife. He testified that on the morning of September 8, 1987, he stopped at the Exxon service station on Highway 19E across from her house to buy gasoline and went to her house to get his jackets. He parked at a pull off at the entrance to the driveway because Mrs. Gouge had told him not to park on her property. He acknowledged seeing Mrs. Hinkle as he walked up the driveway. According to his testimony, he knocked on the door three or four times, but did not get an answer. He walked back down the driveway, got in his car and left. He decided to go back to try to get his record albums, so he turned around and went back to Mrs. Gouge's home. This time he drove up the driveway and again knocked on the door. After getting no answer, he decided to leave without getting any of his possessions.

6

According to the [Petitioner], he drove directly to Sherwood Chevrolet where he arrived shortly before 9:00 A.M. After his arrival, he called the lawyer representing him in his divorce case, Michael O'Connor, to report that he had been to Mrs. Gouge's residence. After his wife called later that morning to report that her mother was missing, he returned to the Gouge residence.

The [Petitioner] admitted that Mrs. Gouge paid $10,000.00 to settle a civil suit which had been brought against him in 1985, and that she had also paid $5,000.00 to his attorneys for their fees in that matter. He admitted that he had not paid any of that money back to the victim. There was also a great deal of testimony by the [Petitioner] concerning the financial gyrations in which he, his wife and Mrs. Gouge had been involved. He and his wife had been indicted for signing the name of a corporation not yet in existence, and he entered a plea of nolo contendre to that charge in exchange for the dismissal of the charges against his wife. They had organized other corporations; he had planned to go to Switzerland to get a million dollars to invest; he contracted to purchase property for $275,000.00 to build his corporate headquarters; borrowed $10,000.00 at a usurious interest rate to broker "high quality steam coal"; and he and his wife agreed to buy a home costing $250,000.00. He alleged that at the time of the offense, he had just returned from Orlando, Florida, where he had made ten thousand dollars "putting together (a) real estate packet for financing." Prior to that he had been a drywall finisher and did residential remodeling.

Michael O'Connor, the [Petitioner's] attorney in the divorce case, testified that he received a telephone call from the appellant at 9:15 A.M. on September 8, 1987. He did not tell him where he was calling from, but, from the background noise, he knew that the [Petitioner] was calling from Sherwood Chevrolet. Mr. O'Connor testified regarding the viewing of the trunk at his office on the afternoon of September 8. The [Petitioner] told him that the dog had sniffed his car and Mr. O'Connor suggested that they look in the trunk. Cross-examination revealed that Mr. O'Connor and his wife had befriended the [Petitioner] in ways far exceeding what he'd done for any other client.

. . . .

7

Based upon this controverted proof, the jury accepted the state's theory based upon the circumstantial evidence and rejected the [Petitioner's] testimony and the testimony of his witnesses.

*Harris,* 1990 WL 171507, at *1-7 (footnotes omitted).

The Petitioner's conviction and sentence were affirmed on appeal by this court. *Id.* The Petitioner sought post-conviction relief in 1992, alleging that he had received the ineffective assistance of counsel and that the State had committed a *Brady* violation. His post-conviction petition was denied, and this court affirmed the judgment. *Ricky Harris v. State*, No. 03C01-9611-CR-00410, 1998 WL 191441 (Tenn. Crim. App, at Knoxville, Apr. 23, 1998), *perm. app. denied* (Tenn. Dec. 7, 1998). The Petitioner filed a motion to re-open his post-conviction petition, alleging the discovery of an alibi witness; the motion was denied on the ground that it "did not state a cognizable ground for reopening the post-conviction petition." *Ricky Harris v. State*, 301 S.W.3d 141, 143 (Tenn. 2010). Our supreme court summarized the Petitioner's subsequent filings and appeals:

On appeal [of the trial court's denial of the Petitioner's motion to re-open his post-conviction petition], a majority of the Court of Criminal Appeals sua sponte treated the motion to reopen as a petition for writ of error coram nobis and remanded the case for a hearing on the merits. After granting the State's application for permission to appeal, this Court held that [the Petitioner] did not state a cognizable ground for reopening his post-conviction petition. *Harris v. State*, 102 S.W.3d 587, 591 (Tenn. 2003). A majority of the Court held that the Court of Criminal Appeals erred in sua sponte treating the motion to reopen as a petition for writ of error coram nobis, although members of the majority disagreed on the reasoning used to reach this conclusion. *Id. at 594*. Two members of the Court dissented, stating that [the Petitioner's] motion [to re-open] asserted a prima facie case for coram nobis relief and raised grounds requiring that the one-year coram nobis statute of limitations be tolled under due process principles. *Id.* at 596 (Anderson, J., concurring in part and dissenting in part).

On March 11, 2004, almost eleven months after this Court's opinion, [the Petitioner] filed a petition for writ of error coram nobis. He based the petition on two items of purportedly newly discovered evidence. The first item related to the potential alibi witness, Ms. Hampton. [The Petitioner] asserted that he did not become aware of the exculpatory nature of the evidence from Ms. Hampton until his private investigator contacted her in 1998. The second item related to someone named "Bill" who in June 1991,

8

approximately three years after the trial, had sent the District Attorney General letters confessing to the murder and absolving [the Petitioner]. Although the "Bill" letters had been given to [the Petitioner's] trial counsel in June 1991, [the Petitioner] contended that he did not obtain evidence proving the exculpatory nature of the letters until he received a handwriting expert's June 2002 report identifying their author.

The trial court summarily dismissed the petition for writ of error coram nobis. The trial court concluded that [the Petitioner] was not entitled to coram nobis relief because his claims did not involve newly discovered evidence because he knew of Ms. Hampton at the time of his trial and the "Bill" letters were an issue as early as the original post-conviction proceeding. The trial court also ruled that the petition was barred by the statute of limitations.

The Court of Criminal Appeals reversed the trial court's dismissal of the petition. The intermediate appellate court remanded the case for a hearing to determine: (1) whether due process considerations require tolling of the statute of limitations; (2) whether the alibi evidence is credible; and (3) whether the third-party confession evidence is newly discovered.

*Harris*, 301 S.W.3d at 143-44. The State appealed to our supreme court this court's decision to reverse the trial court's dismissal, alleging that the Petitioner's petition for error coram nobis was barred by the statute of limitations, and our supreme court agreed. *Id.* at 147. Notably, our supreme court stated that

the opportunity to assert a coram nobis claim was entirely within [the Petitioner's] control after 1998 with regard to the alibi evidence and after June 2002 with regard to the third-party confession evidence. Nothing prevented [the Petitioner] from filing a separate coram nobis action while his motion to reopen was pending.

*Id.* Our supreme court went on to hold

The time within which [the Petitioner] filed his petition for writ of error coram nobis exceeds the reasonable opportunity afforded by due process. [The Petitioner's] delay in seeking coram nobis relief—six years with respect to the alibi evidence and twenty-one months with respect to the third-party confession—is unreasonable under the circumstances of this case. As a matter of law and under the circumstances of this case, [the

9

Petitioner] is not entitled to due process tolling. Therefore, his petition for writ of error coram nobis is barred by the statute of limitations.

*Id.* (footnotes omitted).

## II. Petition for Writ of Error Coram Nobis

In 2017, the Petitioner filed a second petition for a writ of error coram nobis,[1] contending that newly discovered evidence in the form of documents received from the Federal Bureau of Investigation ("FBI") in November 2016 entitled him to a new trial. The documents, which he apparently received through a Freedom of Information Act request, were a letter from the FBI and lab results of testing done by the FBI on hair samples potentially linked to the case. Apparently, in the later-filed third petition, the Petitioner contended that the State had withheld documents pertaining to the investigation of his case that showed that the victim had committed suicide.

The trial court held a hearing on the petition for a writ of error coram nobis, during which the following evidence was presented: The Petitioner testified that he was convicted of the murder of Dolly Gouge and that he filed a petition for writ of error coram nobis after receiving a file from his trial attorney. The file was admitted into the record as evidence. It contained two letters from the United States Department of Justice, specifically the FBI, one addressed to the Petitioner's attorney and the other addressed to the State's attorney in this matter; both were dated July 2015. The letter to the State's attorney read as follows: "We have determined that a report or testimony regarding microscopic hair comparison analysis containing erroneous statements was used in this case" and that such reports or testimony "exceeded the limits of science." The letter further stated that the FBI took "no position regarding the materiality of error in [the Petitioner's] case."

The Petitioner stated that he received the letter from his attorney on August 11, 2015, and on September 11, 2015, he filed a petition for a writ of error coram nobis. He confirmed that the testimony being referred to in the letter was that of FBI Special Agent Douglas Detrick, a witness at the Petitioner's trial qualified as an expert in forensic hair analysis. The hair analysis Special Agent Detrick testified about pertained to a hair sample found in the trunk of the Petitioner's car that the agent said matched the victim's DNA. The Petitioner testified that this was the only piece of physical evidence that linked him to the victim's murder. The Petitioner recalled that the agent's testimony

---

[1]The Petitioner's brief and the trial court's order refer to a third petition filed in case number 23,346. As the State points out, only the second petition is included in the record. We will address the third petition as it pertains to the Petitioner's issues on appeal and to the extent that the petition is addressed in the trial court's order.

regarding the hair impacted his attorney's trial strategy; originally, the Petitioner did not plan to testify but, after the agent's testimony, the Petitioner's attorney told him that the Petitioner needed to testify to rebut the agent's claim that it was the victim's hair found in the Petitioner's trunk.

On cross-examination, the Petitioner stated that he knew before trial that Special Agent Detrick would testify at trial but that the State had a "closed discovery file," and the Petitioner's attorneys were not "privy" to a lot of the evidence. The Petitioner denied having known at trial that the FBI had generated a report on its analysis of the hair sample. The Petitioner reiterated that, after the agent testified, the Petitioner's attorney said he needed to testify to rebut the hair being found in his car.

The Petitioner testified that he had "stipulated to the facts of the offense" at a prior parole hearing but denied that he had admitted to killing the victim. The Petitioner stated that the case was based on circumstantial evidence alone.

Agent Brian Fraley testified that he was employed by the Tennessee Bureau of Investigation ("TBI"). He was in contact with the District Attorney's Office after the FBI sent the letter about the error in the forensic hair analysis done in this case. Agent Fraley was asked to coordinate sending the hair sample to the FBI for additional analysis. Agent Fraley visited the clerk's office where the evidence was stored in a secure vault and checked out the relevant pieces of evidence to be shipped to the FBI.

Dr. Constance Fisher testified that she worked for the FBI as a forensic examiner in the DNA case unit and was qualified as an expert in the field of DNA analysis. Dr. Fisher compared DNA and hair samples collected in this case, including the hair found in the trunk of the Petitioner's car. Dr. Fisher compared the hair samples with DNA taken from the victim's daughter and granddaughter. She concluded that the hair found in the car was likely a match with hair samples taken from the victim and her relatives. A copy of her report of these findings was introduced into the record as an exhibit. It listed the items tested by Dr. Fisher: four samples of hair and two DNA samples from the victim's daughter and granddaughter.

At the conclusion of the hearing, the trial court issued an order, stating that it did not find credible the Petitioner's testimony that he changed his trial strategy because of the FBI agent's testimony. The trial court found Dr. Fisher's testimony to be credible. The trial court stated that while the 2015 letter from the FBI contained evidence of facts not existing at the time of trial and was admissible, the trial court did not find it to be "credible" newly discovered evidence because Dr. Fisher's testimony at the coram nobis hearing confirmed the agent's testimony at trial with regards to the hair matching the victim's DNA. The trial court went on to say that, even if the FBI's letter was to be

11

deemed newly discovered evidence, the outcome of the trial would not have been different. The trial court concluded that the evidence presented at trial, even without the hair analysis testimony, would have led to a guilty verdict because the circumstantial evidence was "simply overwhelming." The trial court further stated that the hair analysis evidence was cumulative evidence to all the other circumstantial evidence in the case and thus did not establish grounds for coram nobis relief.

As to the Petitioner's contention that evidence had been withheld by the State, alleged in his third petition, the trial court stated: "With regard to the additional allegation that the State withheld evidence relating to the victim committing suicide and evidence logs, . . . the Court dismisses this petition without a hearing or appointment of counsel." The trial court reasoned that the petition was not "verified upon the oath of the [P]etitioner, and the affidavit [was] not sworn to by the [P]etitioner." The trial court stated that

> From the unsworn, supporting documents attached to the petition, the date of the alleged suicide at Watauga Lake was 27 May 1987. From the trial transcript, the date of the disappearance of Dolly Gouge was 8 September 1987. The Petitioner is obviously attempting to combine information from two separate investigations in an effort to confuse and obfuscate the true issues in his original petition for writ of error coram nobis. The Court has previously found the Petitioner not to be a credible witness. Therefore, the . . . petition for writ of error coram nobis is respectfully dismissed without a hearing or appointment of counsel.

It is from this judgment that the Petitioner appeals.

### III. Analysis

On appeal, the Petitioner argues that the trial court erred when it denied him the opportunity to establish a reasonable probability that the newly discovered evidence from the FBI would have resulted in a different outcome at his trial, as would the evidence linked to the suicide that he alleges the State withheld at trial. He further alleges that the trial court erred when it dismissed his third petition because no sworn affidavit or oath by the Petitioner accompanied it. Finally, the Petitioner alleges that the trial court showed bias towards the State. The State responds that the trial court did not abuse its discretion when it denied the second petition, nor did it abuse its discretion when it dismissed the third petition where the Petitioner failed to attach the affidavit. Finally, the State contends that the trial court showed no bias or prejudice and that the Petitioner has not provided any evidence to support this allegation.

12

The writ of error coram nobis is a post-conviction mechanism with a long-standing history rooted in the common law and the State of Tennessee. *See State v. Vasques*, 221 S.W.3d 514, 524-26 (Tenn. 2007). It is well-established that the writ of error coram nobis "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

A petition for a writ of error coram nobis "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Bernardo Lane v. State*, No. W2008-02504-CCA-R3-CO, 2009 WL 4789887, at *5 (Tenn. Crim. App., at Jackson, Dec. 11, 2009), *perm. app. denied* (Tenn. June 17, 2010) (citations omitted). "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error coram nobis when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also Vasques*, 221 S.W.3d at 525-28 (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Harris*, 301 S.W.3d at 144 (citing *Mixon*, 983 S.W.2d at 670. The State bears the burden of raising the statute of limitations as an affirmative defense. *Harris*, 301 S.W. 3d at 144 (citation omitted).

In the present case, the Petitioner contends that the FBI letter was newly discovered evidence that would have changed the outcome of the trial. He contends that

other hair samples found in the trunk did not match the victim's or his own hair samples and that this information was withheld by the prosecution. He also contends that the State withheld evidence of a suicide, which he alleges was linked to his case. After review, we conclude that the trial court did not abuse its discretion when it held that the Petitioner was not entitled to coram nobis relief. The letter from the FBI addressed the science surrounding hair analysis generally and did not address the Petitioner's case specifically. The letter made no mention of what hair samples were obtained or tested in the Petitioner's case. At the coram nobis hearing, an FBI employee qualified as an expert in the field of DNA analysis testified that the hair found in the Petitioner's trunk was retested and matched that of the victim. This was the same conclusion testified to by the FBI agent at trial. The letters from the FBI addressed the possibility that the agent's testimony might have overstated the science surrounding hair analysis; Dr. Fisher's examination of the hair samples in the present day revealed the same conclusion as the one presented at trial. Thus, this was not newly discovered evidence. Furthermore, since Dr. Fisher's testimony was essentially the same as the testimony at trial, the outcome of the Petitioner's trial would not have been different, regardless of the evolved scientific method for hair testing. The trial court did not abuse its discretion when it denied the second petition.

As to the Petitioner's contention that his third petition should not have been dismissed for errors related to the filing, we point out that because the petition is not included in the record, we cannot review this issue. However, we conclude that the trial court did not abuse its discretion when it concluded that a dismissal was warranted based on the Petitioner's contention that the prosecution withheld certain evidence related to a suicide. The trial court concluded that these documents related to a suicide were not linked to the Petitioner's case, and the Petitioner provided no evidence otherwise. The trial court's dismissal of this petition, which is not included in the record before us, was therefore not an abuse of discretion.

Finally, the Petitioner contends that the trial court was biased in favor of the State, as evidenced by the trial court's credibility findings. This is not evidence of bias or impartiality; rather, it is an appropriate judgment made by the trial court serving as the trier of fact in this proceeding. The Petitioner is not entitled to relief.

## IV. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

14